Good morning, Your Honors. May it please the Court, Josh Rosenkranz representing VeriFone and Hypercom. Your Honors, there are two points in this appeal that are common ground, undisputed. The first is that the term virtual machine has an ordinary meaning in the tech industry, which is all about enabling computers to run applications in languages that the computers don't understand so that developers can develop applications that are independent of the underlying computer. And the second, everyone agrees that our terminals don't do that. Cardsoft tried to persuade my clients and the entire industry to adopt a virtual machine of the sort that I've just described, but they all rejected it because their customers wanted applications that were communicating directly with the underlying hardware and operating system. The only reason that there is a verdict against my clients is that the district court, the magistrate judge, horribly misconstrued the claim, basically turning the patented invention upside down. So I'd like to talk mainly about claim construction and then, time permitting, circle around sufficiency. Can you start with what I think you understand is the most challenging piece of your claim construction argument? We just talked about claim differentiation. Can you explain, and you don't need to repeat, that claim differentiation is presumption and all that. I guess I don't understand enough to even know, but is there some way in which claim 7, I guess is the principal one, would not be redundant if your view of virtual machines were adopted? Yes, Your Honor. Claim 7 discusses three elements beyond claim 1. The first, wherein the message processor instruction means it's implemented in software defined by the message processor. That is not in claim 1. Claim 1 uses a different locution which looks at the problem from a slightly different perspective, but it's not saying that it's defined by the message processor. Can you explain what that difference is? How that difference in perspective, is there something I can understand? I'm not sure. It's something that I have trouble. It depends on me. You probably can. I have trouble understanding it, but claim 1 refers to a message instruction means that is arranged to provide directions for operation of the virtual message processor, so that's the means directing. And claim 7 is about the message processor instruction means being implemented in software that is defined by the message processor. In one, the actor is the message instruction. In the other, the actor is the message processor. Second, claim 7 includes a microprocessor. Claim 1 does not. And then there's this third element. Now, let me just circle back and say I understand your point that claim differentiation is often a problem. Obviously, as you've acknowledged, it is just a presumption. You go to the specification and see if there's a plain meaning, an ordinary meaning, and a meaning defined by the specification. But I would also add, and this is not a principle of claim construction, but this is a horribly and very sloppily drafted patent, and it's not at all surprising to me that there are points of redundancy. But let me go back to the central point, which is that there is an ordinary meaning to the term virtual machine. Cardsoft does not deny that there is. At the time that this patent was written, everyone in the tech industry was talking about virtual machines. And virtual machines meant to everyone at least one thing, the one thing that the magistrate judge eliminated from the claim construction, and that is platform independence. It's portability. A virtual machine is sort of like a universal adapter. It allows the developer to write a program, an application that is, that doesn't have to be rewritten 12 times for 12 different combinations of the computer. You simply don't write for the underlying platform. You write for the virtual machine, which sits on top of the platform, and the virtual machine literally interprets, translates. Courts have said that over and over again, including this court. The inventor himself said it on page 17-047, that his invention is an invention with a virtual machine that are, quote, not compiled into the native code of the processor, which is to say that they are not written for the specific terminals. Can I just, I find this, just the terms hard here, but let me understand what I think you're arguing. The virtual machine itself has to be written for each hardware, because that's the thing that connects, but then the actual applications that are written for the machine are independent of the underlying hardware. Exactly. Think of it as, as I was saying before, as a universal translator. So the computer, the processor and operating system sit over here. The virtual machine sits on top of it. Of course the virtual machine has to talk to the computer. And your view is that's all commonly understood in the art. Yes, yes. Not just my view, but the patent says it and the inventor himself says it. Well, I'm having a little problem with the patent too, because it does seem like Claim 7 adds that independent stuff in Claim 7 and doesn't include it in Claim 1. But if we read it that way, then it sounds like we have to read virtual machine to be something that's different than commonly understood in the art. Yes. That is absolutely correct. So I go back to what's commonly understood in the art. And I'll emphasize again, we presented to the court this argument about what's commonly understood. And Cardsoft has not disagreed that that was the commonly understood meaning. But to your point, obviously, claim differentiation is only a presumption as we all know. So let's go to the specification. The specification actually defines virtual machine. It's right there front and center. It's in column 3. And it begins with line 34. And while the court is getting there, I'll just underscore again, Cardsoft is trying to say that the specification uses a definition of virtual machine that is different from what everyone else understood. So line 34 begins by discussing the key component of a virtual machine, which is a virtual processor. And that virtual processor, the next line says, is referred to as an interpreter. And it says that that interpreter, that virtual processor, allows programs to operate independent of processor, which is to say independent of the underlying hardware processor. With the newer technique of also adding virtual peripherals, now the whole thing is called a virtual machine. Key component, virtual processor, a bunch of other bells and whistles not defined in this patent. Now it's called a virtual machine. Then it goes on to build on that. On line 40, a virtual machine is computer programmed to emulate a hypothetical computer. Different incompatible computers may be programmed to emulate the same hypothetical computer. Any computer programmed to emulate the hypothetical computer will thus be capable of executing programs for the virtual computer, exactly Judge Hughes's point that the programs are being written to the virtual computer. This creates a complete portable environment for program operations. So in other words, it's simply not a virtual machine unless it performs that interpreting, that translating function, of translating the application from a language that the computer doesn't speak into a program that the computer can understand. And the definition of the problem in the patent underscores this. The central problem that the patent describes as to why you have a virtual machine in the first place, is to make those applications portable from one platform to the next. And it says on column 9, line 50, it is necessary to write a program in the prior art, which is to say a new version of the same program specifically for each type of device. The specification says that's inefficient, that's expensive. At least five times it says that the virtual machine is the solution to that problem. And the specification says twice that those instructions that are part of the application preferably never require translation to any real hardware processor. The prosecution history only confirms that. This is kind of the flip side of the previous case. Here you have the examiner saying over and over again, you haven't invented anything. This is a virtual machine. And Cardsoft, the inventor, doesn't say, no, no, no, it's not a virtual machine. He says, yes, it is a conventional virtual machine with, quote, an addition to a conventional virtual machine. And that's one additional processor. So let me just say briefly what the magistrate judge's mistakes were, and then I'll sit down and reserve my time for rebuttal. The central mistake that the magistrate judge repeated over and over again was to look at the patented invention upside down. He kept saying, apropos of Judge Hughes' point, that because the virtual machine or the virtual processors which sit in the middle can communicate with the computer, with the underlying platform, therefore the application that comes in at the top must also be capable of communicating with the computer. That's exactly wrong. It's exactly why you have a virtual machine to perform that interpreting function. And if there are no further questions, I'd like to reserve the remainder of my time for rebuttal. Thank you. Thank you, Your Honor. You may close the court. Good morning. Thank you. First of all, I think we have to take the position that we strongly disagree with their argument that there is any ordinary meaning to the term virtual machine. We know that the cases they have cited include copyright cases, antitrust cases, and two patent cases, neither of which involved a claim that had the term virtual machine in it. Doesn't that column of the spec early, was it column three or something, just state exactly what they describe the virtual machine as commonly understood to be? It's talking there about a conventional virtual machine, and it talks about what is the inventive virtual machine. It comes out in the prosecution history as well. The inventive virtual machine was the idea of separating the processes. It says nothing in those paragraphs that he talked about as to what language the processes are written in. It says nothing about what language the applications are written in. It does say that you should be able to use an application. That's the emulatable limitation, that the application in the virtual machine can run on computers that have different incompatible hardware or operating systems. Their devices do that. It came out in testimony from their fact witnesses. It came out in testimony from their expert. Their devices do exactly that. We had their Mr. Rosori, a fact witness, an email that he had talking about a virtual machine that Verifone developed so applications would run on the NERIT system and the VERIC system. We showed the porting manual to their expert, which showed how— Well, if that's the case, why weren't you making infringement arguments instead of this claim construction argument that seems to define virtual machine in a way that's contrary to everybody else's definition of virtual machine? Because what they call the conventional definition of virtual machine, which is clear in their opening brief, is that they want to separate the processes from the application. And so the processes would be written in one language and the applications written in another. The problem is the claimed virtual machine requires the applications and the processes to all be a part of the virtual machine. A conventional virtual machine is not that. Okay, this is different. You can't write half of something in one language and half in the other language. If the virtual machine includes the processes and the instructions— So in your understanding of how this patent works, the virtual machine is written in a hardware-dependent language, but the applications are also written in that hardware-dependent language? They can be or they cannot be. That's what you just pointed out in the claim defense. What would be the point of having an intermediary virtual machine if you're already writing the applications in the language of the hardware? Well, now you're focusing on an embodiment of the invention. It's not really the subject of the claims or what was prosecuted. I think it's all about what the definition of virtual machine is. But the portability idea, that was never the problem that was solved in prosecution. The invention that was being prosecuted here was the idea of two separate processors. That's what gave you efficiency and made these devices work better. In fact, made them work was the fact that we separated out message processing from function processing. These are little devices. They had little chips, particularly back in the mid-1990s. They were not capable. I really don't understand then why you're using— if the importance of it is you separated out different processors, why isn't your invention using those separate processors in hardware-dependent language and nothing to do with virtual machines? I think it covers both hardware— Let me back up. If we disagree with you, if we think virtual machine is a term of art that suggests the machine itself is written in independent language, but any applications that run on it are independent language, then you lose, right? No, we still win because they have devices that work exactly like that. That's exactly what I'm talking about. Okay, so that's what I wanted to ask about. If we reverse the claim construction— We still win. Well, you don't win. We'll send it back for a trial. But you don't agree that their devices don't infringe even under their definition of a virtual machine? Absolutely not. Absolutely not. We showed very easily that you could write one application, and depending on the use of just a compiler flag, a dash P, that application could be run like two different— That question is not before us. Very well. That was actually to the sufficiency of the evidence, Your Honor. Again, I do disagree that there's an ordinary meaning here. I think that the language of the specification says what's meant to be a virtual machine, and it doesn't specify one way or the other. As you've pointed out already, the dependent claims make it clear, or should make it clear, that that requirement of a hardware-independent language is not a part of the broadest claim, right? Or else Claim 7 does become redundant, because the first limitation about the message instruction means being written this way, and then again, those are really the same thing. The only thing it might add is a microprocessor. But let's be honest. All of these devices are computers. They have microprocessors in them. That's in the spec. It's a computer program to emulate a hypothetical computer. What I like to look at this as is like Windows is a virtual machine in this respect, right? It works on an Acer computer, a Lenovo computer, a Hewlett-Packard computer, but to you, the user, it looks exactly the same. It doesn't matter what the language is that it's written in. It doesn't matter what language the program's written in that works on Windows. The idea here was to separate out the process. I mean, if you have a Windows for Apple, you can't use that on a Windows for HP. Of course not, but I can use a Windows for HP application on a Windows for Lenovo on a Windows for IBM, even though they have incompatible hardware in them. Well, they don't have incompatible hardware. They've all been set up so that they'll accept a PC version of Windows, whereas an Apple version is set up to accept only an Apple version. Right, but they do have incompatible hardware. That's the point of the virtual machine is you overcome that incompatibility. Their devices have different microprocessors that their witnesses admitted were incompatible with each other. They argued that one would never run a program on any other, but we were able to show that their own documents showed, in fact, they had programs that would work on these two different devices with very different microprocessors that they admitted were the same. That doesn't mean their operating systems are flexible enough, but it doesn't mean they're a virtual machine. Well, I don't know that we have to get into what the difference is between an operating system and a virtual machine. I don't think in 1995 there was a clear meaning, and I think that's why the specification says... When was Java created? Early 1990s, but that's one specific software package that they called the Java virtual machine. It functioned in a very specific way. Isn't that pretty prevalent with what people understood to be virtual machines? I don't believe that the Java virtual machine is an all-encompassing virtual machine. There are known virtual machines that do not act. The message processing interface is a process virtual machine known to the art which is compiled to the native code of the device. It has nothing to do with portable software or anything like that. There are process virtual machines known to the art which are embedded in the code. It doesn't have anything to do with portable language. They're conflating virtual machines to being a universal portable language. It has to apply to every device, and that's not even the common understanding of the term. The Java virtual machine had that feature, but that's the Java product. It's not what people in the art understand a virtual machine to be. Where's your evidence for that? That evidence is not in the record, I'm sorry. I don't have anything in the appendix as to those other virtual machines that don't operate in this way. Can I ask you this question? There was a discussion a few minutes ago about what the proper disposition of this case on appeal would be if we thought that the virtual machine definition construction was wrong. Did you argue in your brief that even if the claim construction that Verifone argues for is correct, you're entitled to a new trial as opposed to the proper result being non-infringement as a matter of law? That would be in the sufficiency of the evidence, where we point out. I don't say if their construction is correct, but I think our description of the evidence that we put in, the porting manual, the testimony of Mr. Rosoria on how their devices work, and again, specifically the porting manual, which is in the appendix. I guess I'm just looking at the subsection, the last piece of 29 to 30 of your brief, not entitled to non-infringement ruling. I take that, it's two paragraphs, I guess, that I take it to say nothing more than they're not entitled to non-infringement because they're wrong about the claim construction. Not that they're not entitled to it if they're right about the claim construction. But, I mean, if you then go on to the next section about cards off proper sufficient evidence to show the accused devices emulate a hypothetical computer, right, which is what the definition of virtual machine is. Even under theirs, it emulates a hypothetical computer. They just say with processing instructions in an independent language. Different limitation? I think it goes hand in hand because if anything is talking about portability, it's this emulating. It's this idea that we can have more than one device that runs the same application and looks the same to a user. As far as a user is concerned, it doesn't matter if it's a VX510 or if it's a Neurit 8400, right? And specifically, on 32. This argument seems to be related to their argument that they still didn't infringe, but then you're saying there's enough evidence. It doesn't relate to the argument if we change the claim construction that they don't infringe. Well, if you change the claim construction, the argument that they don't infringe is our applications are not written in an independent software, right? They're each written specifically for the specific device on which they run. And our evidence here is, and it was presented at evidence, we've got it here. It's the porting manual, which shows I can write one application and run it on either machine. In their blue brief, they specifically made the argument that if their claim construction prevails, they win as a matter of law. Can you point to me to anything specific in your red brief where you say, we disagree. If their claim construction prevails, you should remand for a new trial. The best I can offer you is page 32. That is the evidence proffered by Cardsoft showed, and still does, that accused devices are programmed to be capable of running the same program even though they contain incompatible hardware, meaning that program is portable. It would be in this independent language. But you didn't specifically ask. I never conceded. I think that you did. No, I did not. I never conceded that if they're right, we should win anyway. But you never asked for it. Well, I don't think you have to say you win anyway. I think you have to say you wanted a new trial, but you didn't even say that. No, I did not expressly ask for a new trial if you reverse claim construction. If there are no other questions, then I will see the remainder of my time. Thank you. Your Honors, let me work backwards. First on relief, Judge Taranto and Judge Hughes put your finger on the point. It's waived. I mean, we argued explicitly that the claim construction they cannot prevail under. In their brief, they pointed to nothing that allows them to prevail under the claim construction, and specifically that language, if correct, the new language that it has to be capable of reading instructions that are independent of the platform. Page 32 is an insufficiency argument, is a response to our insufficiency argument, which is premised on their claim construction. The record is clear of page 17-227. Their own expert, Cole, says that Verifone terminals are compiled in native code. That is another way of saying that it is speaking the language of the underlying computer. 17-534, Rosori also says the same thing. Moving back to claim construction, Judge Hughes, again, I think put his finger right on the problem. Why do you need a virtual machine? Why would you ever insert an adapter or an interpreter when the application is speaking the language of the underlying computer? You never would. If I had an interpreter standing between me and the bench, I'm speaking... Can I just briefly respond to the point? I'm a little fuzzy. I mean, virtual machine is a peculiar term, and certainly the Java definition is one, but your friend pointed out that there are other definitions known in the art that could encompass a program like Windows that can run on a variety of PCs. Well, that was the prior art. A program that would be adapted and rewritten to run on each independent platform, that's the prior art that this patent is distinguishing itself from, is distinguishing a virtual machine from. And it's not just... Let me say two other things about it. First, the inventor himself invoked an article, cited an article that describes the Java virtual machine, and secondly, the inventor and the examiner are talking back and forth about the Java virtual machine. The patent that the prosecutor said was the prior art that anticipated was the Java virtual machine. So they're having this discussion back and forth, and at every turn, Cardsoft says, yes, you're right, we've got a conventional Java virtual machine. We're not distinguishing it from that, but we've added something. That's the new innovative thing, which goes to the point that Mr. McBride... This is the message processor? The message processor... So is this basically just a mistake on their part to have drafted Claim 1 to put the message processor under the virtual machine? I don't know the consequence of my question, but... No, Your Honor. So they're defining a virtual machine. They're describing the various ways in which this particular virtual machine works. They take as a given that a virtual machine does some translation, and here are the components of a virtual machine. It has at least two virtual processors, the virtual function processor, and now this is our great invention. We've also added a virtual message processor. So they're saying, in at least prosecution, this is the thing. We added an additional processor, but they never say, hold on, wait a minute, it's not a virtual machine to begin with, so it doesn't need to be the sort of thing that does the interpretation. Because they call it a virtual message processor, among other things. That is correct, and also because they have... And so if I may just say one last sentence, and that is, just because they have identified an additional problem that their patent solves, doesn't mean that all of the language in the patent about solving the portability problem goes out the window with respect to the definition of virtual machine. If there are no further questions, I thank the court for its attention, and we respectfully request that the court reverse and enter a judgment of non-imprisonment. Thank you.